1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Jeffery D. McFarland (Cal. Bar No. 157628)
2  jeffmcfarland@quinnemanuel.com
   Eric Winston (Cal. Bar No. 202407)
3  ericwinston@quinnemanuel.com
   Jennifer Nassiri (Cal. Bar No. 209976)
4  jennifernassiri@quinnemanuel.com
   Razmig Izakelian (Cal. Bar No. 292137)
5  razmigizakelian@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:    (213) 443-3000
7  Facsimile:    (213) 443-3100

8  Attorneys for Layne Leslie Britton

9

10                 **UNITED STATES BANKRUPTCY COURT**

11                 **CENTRAL DISTRICT OF CALIFORNIA**

12                 **LOS ANGELES DIVISION**

13  | In re | Chapter 11 |
    |---|---|
14  | CLOUDBREAK ENTERTAINMENT, INC., | Case No. 2:15-bk-28443-NB |

15  Debtor.

**NOTICE OF MOTION AND MOTION TO CONFIRM PLAN OF REORGANIZATION PROPOSED BY LAYNE LESLIE BRITTON OR IN THE ALTERNATIVE TO APPOINT A CHAPTER 11 TRUSTEE**

18                        **Hearing**

19  Date:       January 29, 2019
    Time:       2:00 p.m.
20  Ctrm:       1545
    Location: 255 E. Temple Street
21              Los Angeles, CA 90012
    Judge:      Hon. Neil Bason

22

23

24

25

26

27

28

1  **TO THE HONORABLE NEIL BASON, UNITED STATES BANKRUPTCY JUDGE, THE**

2  **OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER PARTIES ENTITLED**

3  **TO NOTICE:**

4      **PLEASE TAKE NOTICE** that Creditor Layne Leslie Britton ("Britton") hereby moves this

5  Court (the "Motion") for entry of an order (the "Order"), pursuant to Bankruptcy Code sections

6  105(a), 105(d), 1104, 1122, 1123, 1124, 1125, 1126, 1128, and 1129 (the "Bankruptcy Code"), and

7  Federal Rules of Bankruptcy Procedure 3013, 3015, 3016, 3017, and 3018 (the "Bankruptcy Rules")

8  (i) confirming the *Plan of Reorganization Proposed by Layne Leslie Britton*, filed concurrently

9  herewith (the "Plan") or (ii) alternatively, directing the appointment of a chapter 11 trustee.

10      **PLEASE TAKE FURTHER NOTICE** that this Motion has been served upon the debtor in

11  the above-captioned case, Cloudbreak Entertainment, Inc. ("Cloudbreak"), Debra West ("West"),

12  Conrad Riggs ("Riggs"), the Office of the United States Trustee ("UST"), and all parties entitled to

13  notice, and is based on the supporting Memorandum of Points and Authorities, the attached

14  Declaration of Eric Winston (the "Winston Decl."), the statements, arguments, and representations of

15  counsel who appear at the hearing on the Motion, the files and records in the above-captioned case,

16  any evidence properly before the Court before or at the hearing regarding the Motion, and all matters

17  of which the Court may take judicial notice.

18      **PLEASE TAKE FURTHER NOTICE** that on January 29, 2019 at 2:00 p.m. in Courtroom

19  1545 of the United States Bankruptcy Court for the Central District of California, Los Angeles

20  Division, located at 255 E. Temple Street, Los Angeles, CA 90012, Britton will move the Court for an

21  Order granting the relief sought in the Motion.

22      **PLEASE TAKE FURTHER NOTICE** that this Motion is being heard on regular notice

23  pursuant to Local Bankruptcy Rule 9013-1.  If you wish to oppose this Motion, you must file a written

24  response with the Court and serve a copy of it upon Britton's counsel (as listed on the upper left-hand

25  corner of the first page of this document) no less than fourteen (14) days before the above hearing

26  date.  If you fail to file a written response to this Motion within such time period, the Court may treat

27  such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

28

NOTICE OF MOTION AND MOTION TO CONFIRM PLAN OF REORGANIZATION PROPOSED BY LAYNE
LESLIE BRITTON OR IN THE ALTERNATIVE TO APPOINT A CHAPTER 11 TRUSTEE

1      **WHEREFORE**, based on this Motion, the annexed Memorandum of Points and Authorities,

2 the Winston Decl., the record in this case, and any arguments and evidence presented at or prior to the

3 hearing on this Motion, Britton respectfully requests that the Court enter an order granting the relief

4 requested herein and such other and further relief as the Court deems necessary and appropriate.

5

6 DATED: December 28, 2018            Respectfully submitted,

7                              QUINN EMANUEL URQUHART & SULLIVAN LLP

8                              By:     */s/ Eric Winston*

9                                     Eric Winston
                                    Jennifer Nassiri

10                                     Razmig Izakelian

11                              Attorneys for Leslie Layne Britton

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND ........................................................................................2

    A.      Prepetition Cloudbreak ......................................................................................2

    B.      The Chapter 11 Case .........................................................................................4

        1.      Schedules And Statement Of Financial Affairs .............................4

        2.      Retention And Payment Of Professionals .......................................5

        3.      The West Claim And The Secret Settlement With Riggs ..............6

        4.      The Britton Claim ...........................................................................7

        5.      Cloudbreak's Failed Plan And Subsequent Estimation Motion ....8

        6.      Britton and West Proposed The Joint Plan .....................................9

        7.      Britton's Discovery Of Riggs' Looting ........................................12

        8.      The United States Trustee's Motion To Appoint A Chapter 11 Trustee ......15

        9.      The Status of *Survivor* and *Apprentice* ........................................15

        10.     The Plan ........................................................................................16

III.    REQUEST FOR CONFIRMATION OF THE PLAN ........................................17

    A.      A Separate Disclosure Statement Is Not Required .........................................17

    B.      The Plan Satisfies Each Confirmation Requirement Of Section 1129 Of The Bankruptcy Code ..........................................................................................19

        1.      The Plan Complies With The Applicable Provisions Of Title 11 (11 U.S.C. § 1129(a)(1)) ..................................................................19

        2.      The Plan Proponent Has Complied With The Applicable Provisions Of The Bankruptcy Code (11 U.S.C. § 1129(a)(2)) ..............23

        3.      The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law (11 U.S.C. § 1129(a)(3)) .................23

        4.      The Plan Provides For Required Bankruptcy Court Approval Of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)) ......25

        5.      The Plan Trustee's Identity Has Been Disclosed And His Appointment Is Consistent With Public Policy (11 U.S.C. § 1129(a)(5)) ......25

        6.      11 U.S.C. § 1129(a)(6) Is Not Applicable .....................................26

7.    The Plan Is In The Best Interests Of Creditors And Interest Holders (11 U.S.C. § 1129(a)(7))...................................................................26

8.    The Only Impaired Class (Britton) Has Accepted The Plan (11 U.S.C. § 1129(a)(8)) .................................................................................27

9.    The Plan Complies With Statutorily Mandated Treatment Of Administrative And Priority Tax Claims (11 U.S.C. § 1129(a)(9))............27

10.   The Only Impaired Class Has Accepted The Plan (11 U.S.C. § 1129(a)(10)) ........................................................................................28

11.   The Plan Is Feasible (11 U.S.C. § 1129(a)(11))............................28

12.   The Plan Provides For Payment Of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)) ...........................................................29

13.   11 U.S.C. § 1129(a)(13)-(16) Are Not Applicable........................29

14.   The Plan Satisfies 11 U.S.C. § 1129(b)........................................29

C.    The Plan Better Serves The Interests Of All Parties And The Purposes Of The Bankruptcy Code...................................................................................30

IV.   BRITTON'S ALTERNATIVE REQUEST FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE ...................................................................................30

1.    The Looting Of Corporate Assets Requires Appointment Of A Trustee .....31

2.    The Non-Ordinary Course Dealings Between Cloudbreak And Bungalow Support The Appointment Of A Chapter 11 Trustee.................32

3.    The Undisclosed West/Riggs Transaction Warrants The Appointment Of A Trustee .............................................................................33

4.    During The Course Of The Case, Riggs Has Done Nothing To Maximize The Value Of Cloudbreak's Estate .............................................34

V.    CONCLUSION ...................................................................................................35

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>                                                                                 <u>Page</u>

3

4
*Fowler v. Shadel*,
    400 F.3d 1016 (7th Cir. 2005) ............................................................ 19

5
*Holywell Corp. v. Bank of New York*,
    59 B.R. 340 (S.D. Fla. 1986) ............................................................. 22

6

7
*In re Amster Yard Assocs.*,
    214 B.R. 122 (Bankr. S.D.N.Y. 1997) ......................................... 17, 18

8
*In re Arnold & Baker Farms*,
    177 B.R. 648 (B.A.P. 9th Cir. 1994),
9
    *aff'd*, 85 F.3d 1415 (9th Cir. 1996) ................................................... 18

10
*In re Art and Architecture Books of the 21st Century*,
    2016 WL 1118743 (Bankr. C.D. Cal. Mar. 18, 2016) ................. 23, 24

11
*In re Bibo, Inc.*,
    76 F.3d 256 (9th Cir. 1996) ............................................................... 32
12

13
*In re Calvert*,
    135 B.R. 398 (Bankr. S.D. Cal. 1991) ............................................... 18

14
*In re Celeritas Techs., LLC*,
    446 B.R. 514 (Bankr. D. Kan. 2011) .................................................. 35

15

16
*In re Colby Constr. Corp.*,
    51 B.R. 113 (Bankr. S.D.N.Y. 1985) ................................................. 32

17
*In re Colony Props. Int'l, LLC*,
    2011 WL 4443319 (Bankr. S.D. Cal. Sept. 19, 2011) ............. 17, 18, 23

18
*In re Grasso*,
    490 B.R. 500 (Bankr. E.D. Pa. 2013) ................................................. 33
19

20
*In re Gulf Coast Oil Corp.*,
    404 B.R. 407 (Bankr. S.D. Tex. 2009) ............................................... 17

21
*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ......................................... 31, 34

22

23
*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)
    *aff'd Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ........................................... 29

24
*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................... 24
25

26
*In re Marvel Entm't Grp., Inc.*,
    140 F.3d 463 (3d Cir. 1998) .............................................................. 31

27
*In re Mcorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992),
28
    *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex. 1992) ................. 29

*In re Microwave Prods. of Am., Inc.*,
102 B.R. 666 (Bankr. W.D. Tenn. 1989) ........................................................ 31, 34

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) ...................................................................... 18

*In re Nickels Midway Pier, LLC*,
452 B.R. 156 (D. N.J. 2011) ................................................................................. 19

*In re North*,
212 F. App'x 626 (9th Cir. 2006) ......................................................................... 33

*In re Orlando Investors, L.P.*,
103 B.R. 593 (Bankr. E.D. Pa. 1989) ................................................................... 28

*In re Plaza de Retiro, Inc.*,
417 B.R. 632 (Bankr. D. N.M. 2009) .................................................................... 33

*In re PRS Ins. Grp., Inc.*,
274 B.R. 381 (Bankr. D. Del. 2001) ................................................................ 32, 34

*In re Resorts Int'l, Inc.*,
145 B.R. 412 (Bankr. D.N.J. 1990) ....................................................................... 25

*In re River Village Assocs.*,
181 B.R. 795 (E.D. Pa. 1995) ............................................................................... 30

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) .................................................................... 25

*In re Stolrow's, Inc.*,
84 B.R. 167 (B.A.P. 9th Cir. 1988) ....................................................................... 24

*In re Sylmar Plaza,L.P.*,
314 F.3d 1070 (9th Cir. 2002) .............................................................................. 23

*In re te Velde*,
2018 WL 4405981 (Bankr. E.D. Cal. Sept. 12, 2018) .......................................... 33

*In re Texaco, Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) .................................................................... 23

*In re V. Savino Oil & Heating Co., Inc.*,
99 B.R. 518 (Bankr. E.D.N.Y. 1989) .................................................................... 33

*In re William H. Vaughan & Co., Inc.*,
40 B.R. 524 (Bankr. E.D. Pa. 1984) ..................................................................... 34

*In re Woodson*,
839 F.2d 610 (9th Cir. 1988) ................................................................................ 31

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
813 F.2d 1177 (11th Cir. 1987) ............................................................................ 22

*Packard v. Cooper*,
2008 WL 4926962 (C.D. Cal. Nov. 13, 2008) ...................................................... 25

*Search Market Direct, Inc. v. Jubber (In re Paige)*,
685 F.3d 1160 (10th Cir. 2012) ............................................................................ 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Steelcase Inc. v. Johnston (In re Johnston)*,
   21 F.3d 323 (9th Cir. 1994) .................................................................................... 20

*United States v. Energy Resources Co., Inc.*,
   495 U.S. 545 (1990) ................................................................................................ 21

## **Statutory Authorities**

11 U.S.C. § 105(d) ............................................................................................................ 17

11 U.S.C. § 363(b) ............................................................................................................ 33

11 U.S.C. § 365 ................................................................................................................. 23

11 U.S.C. § 502(d) .............................................................................................................. 6

11 U.S.C. § 507(a) ..................................................................................................... 20, 27

11 U.S.C. § 726(a) ............................................................................................................ 27

11 U.S.C. § 1104 ........................................................................................................... 1, 31

11 U.S.C. § 1111(b) .......................................................................................................... 26

11 U.S.C. § 1122 ............................................................................................................... 19

11 U.S.C. § 1123 ........................................................................................... 19, 20, 21, 22

11 U.S.C. § 1123(b)(3) ..................................................................................................... 21

11 U.S.C. § 1123(b)(6) ..................................................................................................... 21

11 U.S.C. § 1126(f) ..................................................................................................... 18, 27

11 U.S.C. § 1129 ....................................................................................................... passim

28 U.S.C. § 1930 .............................................................................................................. 29

Fed. R. Bankr. P. 3006 ..................................................................................................... 11

## **Legislative Materials**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) ..................................................... 19

## **Additional Authorities**

Alan J. Resnick, *et al.*, 7 *Collier On Bankruptcy*, ¶ 1122.03[1] (16th ed. rev. 2015) ..................... 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Britton requests that this Court confirm the plan of reorganization filed concurrently herewith (the "Plan"), which treats as unimpaired all holders of allowed claims (other than Britton) and the equity interests of Cloudbreak, establishes a plan trust, and appoints a plan trustee to administer estate assets. Under Britton's proposed Plan, all allowed claims other than Britton's claim will be paid in full on the effective date. Post-effective date cash flow will be used to fund a reserve for Britton's claim, and to fund litigation against *both* Britton and Riggs. Most importantly, Cloudbreak's assets will be transferred to a plan trust, to be administered by an independent plan trustee. The plan trustee will have the exclusive authority to investigate, pursue, and/or settle causes of action or objections to claims, and to transact Cloudbreak's assets.

As set forth herein, the proposed Plan satisfies all of the elements of 11 U.S.C. § 1129, does not require a disclosure statement, and can (and should) be confirmed. Confirmation of the Plan is the preferred path because it will eliminate additional administrative expenses while providing for immediate distributions to holders of allowed claims.

But if the Plan cannot be confirmed at this time, then Britton requests that this Court appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104. This is because the current fiduciary for Cloudbreak - Conrad Riggs - has not only mismanaged estate assets and made numerous questionable decisions regarding Cloudbreak for years, but has affirmatively harmed Cloudbreak's estate by taking Cloudbreak's money to pay over a hundred thousand dollars in personal benefits. Not surprisingly, the Office of the United States Trustee (the "UST") has independently moved for the appointment of a chapter 11 trustee. As demonstrated below, "cause" is easily satisfied.

Whether the Plan is confirmed or a chapter 11 trustee is appointed, the key feature of each is the appointment of an independent fiduciary to manage Cloudbreak's assets. The need for an independent fiduciary is obvious and critical because Riggs has repeatedly sought to abuse Cloudbreak's estate for his own benefit. Riggs' misconduct includes:

- Using Cloudbreak's money to pay for personal expenses in excess of $100,000. Only when he was caught did he reluctantly agree to return a portion of the looted funds;

- Forcing Cloudbreak to pay Riggs rent for space that Cloudbreak does not need, and increasing the rent by 25% without seeking approval under 11 U.S.C § 363(b);

- Proposing a facially unconfirmable plan last year that gifted Riggs an allowed $1 million claim that was entirely inappropriate;

- Failing to monetize (or consider monetizing) any assets of Cloudbreak, such as the payment stream associated with *The Apprentice*, which is now likely worthless;

- Refusing to consider commencing avoidance actions against himself;

- Unfairly burdening Cloudbreak with legal fees and costs that Riggs is personally responsible for paying; and

- Entering into a secret agreement with West so that West would withdraw her proof of claim and co-authorship of a joint plan of reorganization, so that Riggs could remain in control of Cloudbreak.

Each of these acts alone supports the appointment of an independent fiduciary; together, they make it clear that Riggs must not be left in control.  Over 18 months ago, in opposition to Riggs' efforts to propose, via Cloudbreak, the facially unconfirmable plan, Britton wrote that the fiduciary compass in this case was broken.  Nothing has changed in respect of Riggs' conduct, but this Court has the power and the duty to ensure that a fiduciary maintains stewardship.

## II.    FACTUAL BACKGROUND

### A.    Prepetition Cloudbreak

Cloudbreak is a privately held corporation formed in 2000 by Riggs.[1]  Riggs has been and currently is Cloudbreak's only employee, sole owner, sole director, and president.[2]  Cloudbreak has no operations and conducts no business.  Its primary source of revenue was (and is) payments received in connection with the television programs *Survivor* and *The Apprentice*.  ECF 245 at 11.

In August 2000, Cloudbreak entered into an agreement with Mark Burnett and affiliates ("Burnett") for Cloudbreak to provide services in connection with the development of certain

---

[1] ECF 20 at 2 (initial status report).

[2] Supplemental Declaration of Shahin Rezvani dated December 10, 2015, ¶ 3, Ex. B. at 18:7-11, 21:12-14, 23:1-2 [ECF 11-1] ("Rezvani Decl.").

programs, including *Survivor* and *The Apprentice*, under which Cloudbreak was to receive 10% of all sums received from these projects (the "Burnett Agreement").  *Id.*  In July 2008, Cloudbreak and Riggs filed a lawsuit for breach of the Burnett Agreement, and in March 2012, entered into a settlement agreement (the "MBP Settlement Agreement").  *Id.*  Pursuant to the MBP Settlement Agreement, payments are made to Cloudbreak for *Survivor* and *The Apprentice*.  *Id.*[3]

All of Cloudbreak's prepetition gross revenues from 2013-2015 were derived from the MBP Settlement Agreement.  *Id.*  During this period, Cloudbreak received in excess of $5.3 million.  ECF 49 at 1.  It is unknown how much Riggs took from Cloudbreak during this period, but it appears that Riggs paid himself over $4.5 million from 2011 to 2015.  ECF 245 at 6.  It also appears that Riggs caused Cloudbreak to distribute more than $1.75 million to a self-settled trust in the ten years prior to the Petition Date (defined below).[4]  In the year preceding the Petition Date, Cloudbreak also paid over $67,000 to American Express, very likely on account of Riggs' personal expenses.  ECF 49 at 9-22.

Two creditors filed proofs of claims relating to monies that Cloudbreak is entitled to receive under the MBP Settlement Agreement:  West and Britton.  West is Riggs' ex-wife, and, until very recently, asserted that she is entitled to a percentage of the funds Cloudbreak received pursuant to a marital settlement agreement between her and Riggs.  Claim 5-1.

Britton is entitled to a percentage of the funds Cloudbreak receives pursuant to a consulting agreement (the "Britton Agreement").  Claim 4-1.  In November 2012, Britton commenced an action for breach of the Britton Agreement in the Superior Court for the County of Los Angeles - *Layne Leslie Britton v. Conrad Riggs, Cloudbreak Entertainment, Inc.*, Case No. BC496298 (the "State Court Litigation").[5]

---

[3] As discussed below, *The Apprentice* was cancelled after airing its last show in February 2017 and Cloudbreak failed to monetize the asset.

[4]  In Cloudbreak's statement of financial affairs filed on December 15, 2015, Cloudbreak disclosed that it had made over $1.75 million in payments to a self-settled trust called the Cloudbreak Entertainment, Inc. Retirement Trust (with Riggs as trustee) (the "Self-Settled Trust").  ECF 16 at 3.  In an amended statement of financial affairs filed on January 15, 2016, Cloudbreak removed referenced to the Self-Settled Trust.  ECF 49 at 3.  There has been no visibility into this change.

[5]  The State Court Litigation is discussed in detail below.

Even though it has no operations or employees, Cloudbreak asserts that its principal place of business located at 2958 Exposition Blvd., Santa Monica, CA 90404 (the "Exposition Property"). ECF 1 at 1. The Exposition Property is owned by Bungalow Properties, LLC ("Bungalow"). ECF 20 at 8 (initial status report). Riggs owns 100% of Bungalow, and is its chief executive officer, sole manager, and member. *Id.*; Winston Decl., Ex. K. On information and belief, the Exposition Property is a residential property that has been recently advertised as a rental, Winston Decl., Ex. L, despite the fact that Cloudbreak asserted the property is "used as Cloudbreak's principal office and for storage, in particular for business and litigation records." ECF 380 at Ex. D ("Winston 11/15/18 Decl.").

**B.      The Chapter 11 Case**

On December 1, 2015, the day before the scheduled trial in the State Court Litigation, Riggs caused Cloudbreak to file a chapter 11 petition (the "Petition Date"). ECF 1. The purpose of the filing was clear - to stave off litigation. Britton immediately moved for relief from stay, which this Court granted. *See* ECF 11, 58, 72.

While the bankruptcy did not pan out as Riggs expected because this Court granted relief from stay, one (perhaps unintended) consequence of the bankruptcy filing is that Riggs has not been able to take all of the money from Cloudbreak, and millions of dollars have been preserved by the existence of this chapter 11 case. As of November 30, 2018, Cloudbreak was sitting on more than $3.5 million in cash. ECF 398 at 17 (November 2018 monthly operating report).

**1.      Schedules And Statement Of Financial Affairs**

Cloudbreak filed on December 15, 2015 its required schedules of assets and liabilities and a statement of financial affairs (the "Schedules"), and later filed amended Schedules. ECF 16-18, 47-49. The Schedules disclosed that as of the Petition Date Cloudbreak had only $40,409.74 in cash on hand and that its assets included: (a) $245,900 in accounts receivable; (b) $20,580 in office furniture and collectibles; (c) interests in certain intangible and intellectual property (including future revenues from *Survivor* and *The Apprentice*) of an unknown value; (d) a $7,500 loan to David Russo; (e) cross-claims against Britton of an unknown value; and (f) the Self-Settled Trust, with an unknown value. ECF 47 at 1-6. The Schedules disclosed that Cloudbreak had an oral month-to-month lease with Bungalow for the Exposition Property, at $2,000 per month. ECF 17 at 4, 16; ECF 48 at 2.

1    Cloudbreak scheduled Britton's claim as contingent, unliquidated, and disputed. ECF 17 at 13.

2    It also scheduled certain other claims: (a) a $1,231,514.83 claim held by Browne George Ross, LLP

3    ("BGR") that was noncontingent, liquidated, and undisputed; (b) a $0 contingent claim held by

4    Liberty Ranch Holding (Debra West) for 15% of 75% of fees received from *Survivor* and 50% of 75%

5    of fees from *The Apprentice*; (c) a $0 contingent claim held by Munger Tolles & Olson LLP ("MTO")

6    for 25% of fees from *Survivor* and *The Apprentice*; and (d) Cloudbreak filed amended schedules on

7    December 15, 2015 adding a contingent and unliquidated claim held by Riggs based on "Payment of

8    legal fees on behalf of Debtor." ECF 18 at 3-4.

9    **2.    Retention And Payment Of Professionals**

10    Cloudbreak retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as bankruptcy counsel, and

11    Gordon Fishburn & Major, LLP d/b/a The Brentwood Management Group ("Brentwood") as business

12    management consultant. ECF 53, 108.

13    Cloudbreak also retained BGR as special counsel for the State Court Litigation. ECF 26, 64.

14    Under BGR's original retention agreement, Cloudbreak and Riggs were jointly and severally liable for

15    all of BGR's fees and expenses, meaning that both were liable for 100% of the fees and costs incurred

16    by BGR. ECF 26 at 3-4  Postpetition, the parties amended the retention agreement. *Id.* Under the

17    amended agreement, Riggs paid BGR $425,000, allegedly on account of BGR's prepetition claim

18    against Cloudbreak, and BGR wrote off $100,014.83, leaving a pre-petition claim of $725,000. *Id.*

19    The amended retention agreement also provided that Riggs and Cloudbreak would now be separately

20    liable for fees, and BGR had allocated 90% of its fees to Cloudbreak and 10% to Riggs. *Id.* at 4.[6]

21    It does not appear that the 90%/10% split between Cloudbreak and Riggs existed prior to the

22    Petition Date; instead, Cloudbreak paid 100% of the fees BGR incurred prepetition. Riggs has not

23    reimbursed Cloudbreak for the monies Cloudbreak paid to BGR on Riggs' behalf, and no independent

24    fiduciary has determined that foisting 90% of BGR's fees on Cloudbreak is fair to Cloudbreak.

25

26    [6] The amended retention agreement provided that any amounts not paid by Cloudbreak would be
paid by Riggs by November 30, 2016. ECF 30 at 16. Riggs allegedly paid BGR in September 2016

27    as a "loan to Cloudbreak." ECF 206. There was no approval by this Court sought for this purported

28    loan.

1    Since being retained, PSZJ, Brentwood, and BGR have each only filed two interim fee

2 applications. ECF 113-115, 280-282. The Court has authorized the payment of fees and expenses

3 incurred from December 1, 2015 through June 30, 2016, and approved fees and expenses for the

4 period July 1, 2016 through September 30, 2017. ECF 180, 185, 191, 299. Oddly, no estate

5 professional has filed interim fee applications covering October 1, 2017 to the present; in other words,

6 estate professionals have gone over a year without seeking interim compensation.

7    **3.    The West Claim And The Secret Settlement With Riggs**

8    On February 5, 2016, West filed an unliquidated claim (the "West Claim"). Claim 5-1. She

9 asserted that pursuant to a confidential stipulated judgment entered in November 2011 as a property

10 settlement in marital dissolution proceedings between her and Riggs, she was entitled to a percentage

11 of ongoing payments from *Survivor* and *Apprentice*. *Id.* at 4. She contended that she was entitled to

12 sums under a further stipulated judgment, payments were improperly received, held, and used by

13 Cloudbreak, and that she had not received royalties, accounting, or underlying documents since

14 November 2015. *Id.*

15    On November 30, 2016, Cloudbreak filed an objection to the West Claim, arguing that it was

16 not a party to the property settlement in the divorce proceeding, and thus, none of the amounts sought

17 through the West Claim were Cloudbreak's payment obligations. ECF 169. On July 5, 2017, Britton

18 also filed an objection to the West Claim, arguing that the claim was not enforceable against

19 Cloudbreak, and that it was subject to disallowance under 11 U.S.C. § 502(d). ECF 256.[7] The

20 hearing on the claim objections was continued several times and ultimately went off calendar. *See*

21 ECF 320. Following the filing of the Joint Plan (defined below), Cloudbreak re-noticed its objection,

22 ECF 364, and the hearing on that objection was continued to January 29, 2019.

23    Under the Joint Plan (defined below), Britton and West agreed to a settlement of West's claim.

24 ECF 342, 343. Pursuant to the settlement, West would receive a payment of at least $495,000 on the

25 effective date of the Joint Plan, future payments received on account of *Survivor* (10% of 65%) and

26 _____

27    [7] In the four years prior to the Petition Date, West received nearly $500,000 from Cloudbreak.
*See* ECF 256 at Ex. 4. There is no evidence that West provided any goods or services to Cloudbreak.

28 Britton believes that these payments are avoidable.

*The Apprentice* (50% of 75%) after the effective date, and would subordinate $65,000 plus 5% of 65% of future *Survivor* payments to all other allowed claims.  ECF 342 at 11-12, 18-19.

### 4.    The Britton Claim

Britton filed a proof of claim asserting: (i) damages of $27,400,000.00, comprised of a prepetition damages claim, prepetition interest claim, and attorneys' fees claim; and (ii) a claim for future damages based on the anticipated income stream for *Survivor and Apprentice* (the "Britton Claim").  Claim 4-1.

In the State Court Litigation, Britton alleged that Cloudbreak breached the Britton Agreement by failing to pay over monies Cloudbreak received under the Burnett Agreement.  Rezvani Decl., Ex. E.  Following a series of rulings eliminating Cloudbreak's and Riggs' defenses, the evening before trial, Riggs caused Cloudbreak to file bankruptcy.  *Id.*, Exs. H, I, J, L.

Britton promptly filed a motion for relief from stay to proceed with the State Court Litigation, which the Court granted.  ECF 11, 58, 72.  After obtaining relief from stay, Britton proceeded to trial against Cloudbreak on two claims: (1) breach of contract for damages through December 2015; and (2) money had and received.  ECF 390 at 10.  The jury found for Britton on both claims.  *Id.*  Due to errors in the verdict, however, it awarded Britton only $489,850 in damages on the breach of contract claim and no damages on the money had and received claim, despite the fact that Britton is entitled to at least $9,544,168 in damages on the money had and received claim.  *See id.* at 10-12.  The state court granted Britton a new trial on the money had and received claim, but denied a new trial on the breach of contract claim.  *Id.* at 12.  The parties appealed.  *Id.* at 14.

On December 5, 2018, the Court of Appeal issued its decision (the "State Appeal Decision").  ECF 390.  It held that it lacked jurisdiction on the matters appealed by Cloudbreak and Riggs, i.e., their challenges to the state court's orders on the parties' summary adjudication motions.  *Id.* at 16.  It also held that the state court's order concerning the new trial was void because Britton had filed a notice of intent to move for a new trial before the state court had ruled on alter ego liability.  *Id.* at 22-24.  In other words, Britton will move again for a new trial following the state court's ruling on alter ego liability, which itself has no bearing on whether Britton is entitled to a new trial.  Thus, it is likely that the state court will reach the same conclusion and grant Britton a new trial.

Because Cloudbreak has continued to receive money on account of *Survivor* after the Petition Date, Britton is entitled to 35% of such funds. Thus, the liquidated amount of the breach of contract portion of the Britton Claim includes approximately an additional $1.7 million. *See* ECF 398 at 15 (cumulative post-petition revenue is $4,924,689.90 as of November 30, 2018).

### 5.   Cloudbreak's Failed Plan And Subsequent Estimation Motion

On June 1, 2017, Cloudbreak, at Riggs' direction, filed a proposed plan of reorganization (the "Cloudbreak Plan"). ECF 245. Even though it had been objected to by Cloudbreak, the Cloudbreak Plan treated the West Claim as allowed in full, payable with cash. *Id.* at 18. The Cloudbreak Plan gifted to Riggs an allowed $1 million claim, even though he did not file a proof of claim and Cloudbreak did not schedule him as holding a liquidated, undisputed and non-contingent claim. *Id.* at 19.[8] The Cloudbreak Plan also gifted to MTO an allowed claim in full, even though it did not file a proof of claim. *Id.* at 18.

While providing full payment to West, Riggs and MTO, Cloudbreak designed its plan to limit distributions to Britton to $637,609.67 regardless of the outcome of the State Court Litigation, and without any future payment of *Survivor* or *Apprentice* cash flow. *Id.* at 18-19.

Britton objected to the proposed disclosure statement accompanying the Cloudbreak Plan, arguing that the Cloudbreak Plan was facially unconfirmable. Given the obvious defects, on August 22, 2017, the Court indicated that the Cloudbreak Plan was facially unconfirmable. *See* ECF 272 (Aug. 22, 2017 Tr. at 8:14-16) ("I don't think the plan in its current form is -- has a sufficient chance of being confirmable.").

With its attempt to inappropriately gift Riggs and others allowed claims while ensuring that Riggs retained control of Cloudbreak, it would have been expected that an estate fiduciary would try to negotiate a fair plan of reorganization. But because Cloudbreak's sole fiduciary was Riggs, that never happened; Cloudbreak did not engage in any good faith negotiations with Britton, but instead decided to try to estimate the Britton Claim, again with the goal of keeping Riggs in control. On

---

[8]   The Cloudbreak Plan further provided that within four years before the Petition Date, Riggs "received distributions from [Cloudbreak] totaling $4,518,300." Cloudbreak Plan at 6.

December 5, 2017, Cloudbreak filed a motion seeking to estimate the Britton Claim at initial amount of $637,609.67 (the "Estimation Motion"). ECF 297.

In its Estimation Motion, Cloudbreak acknowledged for the first time that capping Britton's distribution at that amount was inappropriate, and suggested that it would fix a minimum reserve for the Britton Claim and a mechanism to allocate future cash flow amongst Britton, Cloudbreak, and other creditors. *Id.* at 4. But the Estimation Motion was fatally flawed because Cloudbreak provided no mechanism to ensure that the Britton Claim, if allowed, would actually be paid from future proceeds. Britton filed an opposition, stating that the Britton Claim was not subject to estimation, but suggesting that an appropriate estimated amount would be the principal amount of the "money had and received" claim. ECF 314.

At the March 2018 hearing, the Court indicated that an appropriate estimation would be $2.5 million, though <u>not</u> subject to a cap. *See* ECF 352 (Mar. 20, 2018 Tr. at 8:8-9) ("So bottom line, $2.5 million for purposes of that non-final estimation."). The Court also noted it would be beneficial to see distributions made to creditors sooner rather than later. *Id.* at 13:1-4 ("I don't think disputes over particular claims should necessarily put everyone on lockdown, where nobody gets paid anything until all disputes are fully resolved.").

Because even a $2.5 million reserve would never work for Riggs personally, Riggs made sure that Cloudbreak did nothing further to advance the chapter 11 case. Once Cloudbreak was not successful obtaining from the Court a lowball estimation of the Britton Claim, Cloudbreak was inclined to let the chapter 11 case languish. Cloudbreak did nothing for months.

### 6.    Britton and West Proposed The Joint Plan

Following the hearing on the Estimation Motion, Britton and West determined that it was in the best interests of all parties to move the case forward by jointly proposing a plan that would treat all creditors fairly and protect Cloudbreak through the appointment of an independent plan fiduciary (the "Joint Plan"). After lengthy arms-length negotiations, on May 2, 2018 the parties reached agreement on a plan structure, entered into a common interest agreement, and spent the next few months drafting the Joint Plan and an accompanying disclosure statement (the "Joint Plan Disclosure Statement"). *See* Winston 11/15/18 Decl. ¶ 3.

On August 7, 2018, Britton and West filed their Joint Plan Disclosure Statement and Joint Plan, along with a motion to approve the Joint Plan Disclosure Statement. ECF 341-343. The Joint Plan proposed to pay all claims in full (without postpetition interest), except for West and Britton. West would receive at least $495,000 on the effective date of the Joint Plan, future payments received on account of *Survivor* (10% of 65%) and *The Apprentice* (50% of 75%) after the effective date, and would subordinate $65,000 plus 5% of 65% of future *Survivor* payments to all other allowed claims. ECF 342 at 11-12, 18-19. Britton would not receive any payment until conclusion of the State Court Litigation, but a certain percentage of funds would be set aside as a reserve. *Id.* at 19-20.

A cornerstone of the Joint Plan was that an independent fiduciary would be appointed as a plan trustee to manage post-confirmation assets, including prosecution of avoidance claims and monetization of assets. *Id.* at 21. This was critical to Britton because, even though the Joint Plan did not allow his claim, he would not be at risk of estate assets being ignored, squandered, or stolen. West agreed with Britton that it was critical an independent fiduciary be appointed for Cloudbreak.

Cloudbreak (at Riggs' direction) and Riggs (personally) objected to the Joint Plan Disclosure Statement. ECF 356, 357. A major theme of the objections was to attack the good faith of West and Britton for daring to propose a plan that allowed the West Claim at a reduced amount, despite the fact that a year earlier, Cloudbreak had proposed to allow the West Claim *in full*.

At the October 2, 2018 hearing on approval of the Joint Plan Disclosure Statement,[9] West's counsel represented to the Court:

> Ms. West, as I mentioned, agreed to significantly compromise her claim. Mr. Britton agreed to a much lower reserve than what he felt was appropriate, in exchange for an independent fiduciary that would be there to sort of mitigate the additional risk that he was taking on, and also to make sure that the assets of the debtor were preserved, pending the outcome of this litigation. **And Ms. West insisted that this fiduciary be truly independent, that it -- that the fiduciary not be controlled by her in any way, not be controlled by Mr. Britton in any way, be a professional independent fiduciary that would be subject ultimately to the oversight of this Court.**

ECF 367 (Oct. 2, 2018 Tr. at 18:21-19:7) (emphasis added).

---

[9] Just hours before the hearing, Cloudbreak filed its own amended plan which largely mimicked the Joint Plan, with the exception that Riggs would continue to control Cloudbreak's assets, rather than an independent plan trustee. ECF 361.

1    The Court rejected Cloudbreak's argument that the Joint Plan was facially unconfirmable but

2  requested supplemental briefing on two specific legal issues: the appointment of a plan trustee and the

3  standards for approval and level of deference afforded to the settlement of the West Claim. *See id.* at

4  26-28.  The Court continued the hearing to November 6, 2018 (the "November 6 Hearing") and set a

5  briefing schedule for supplemental briefs.

6    On November 5, 2018 at approximately 1:15 p.m. (one day before the November 6 Hearing),

7  West's counsel telephoned Britton's counsel to disclose that West and Riggs had entered into a

8  confidential settlement agreement (the "West/Riggs Transaction"), and that West would be

9  withdrawing the West Claim and Plan Proponent status.  Winston 11/15/18 Decl. ¶ 12.  Britton's

10  counsel requested a copy of the West/Riggs Transaction documents, but West refused to turn it over.

11  *Id.* ¶ 13.  Within minutes of the conversation, West filed her withdrawal of the West Claim and

12  withdrawal of support of the Joint Plan.  *Id.*; ECF 373, 374.  Britton's counsel then sent an e-mail

13  again requesting a copy of the West/Riggs Transaction documents and communications, which was

14  refused.  Winston 11/15/18 Decl. ¶ 14 & Ex. E.

15    The next day, at the November 6 hearing, counsel for Riggs and Cloudbreak argued that with

16  the (attempted) withdrawal of the West Claim, the chapter 11 case was now a mere "two party"

17  dispute that the case ought to be dismissed.  Dismissal of the chapter 11 case would no doubt greatly

18  benefit Riggs - not only would it free up the $3.5 million in cash that has been protected by this Court,

19  there would be substantial risk that Riggs would be in a position to take assets from Cloudbreak, grant

20  himself claims against Cloudbreak, and burden Cloudbreak with more of his expenses.  Moreover,

21  Riggs might be able to avoid the consequences of taking Cloudbreak's money during the course of the

22  chapter 11 and entering into a secret deal with West.

23    West did not timely file a motion to authorize the withdrawal of the West Claim; thus, on

24  November 15, 2018, Britton filed a motion under Bankruptcy Rule 3006 for an order that the

25  unilateral withdrawal of the West Claim was not effective absent a Court order, and that any Court

26  order permitting withdrawal should require disclosure of the West/Riggs Transaction and

27  reimbursement of certain of Britton's attorney's fees and expenses (the "Rule 3006 Motion").  ECF

28

Case No. 2:15-bk-28443-NB

MEMORANDUM OF POINTS AND AUTHORITIES

380.  Both West and Riggs have opposed the Rule 3006 Motion.  The Rule 3006 Motion is set to be heard on January 8, 2019.

### 7.    Britton's Discovery Of Riggs' Looting

On October 3, 2018, Cloudbreak filed a monthly operating report ("MOR") for the month of August 2018.  ECF 366.  Britton's counsel noticed several odd disbursements, such as a payment to American Express for $14,158.89 and a $4,887.57 Cobra health insurance payment to Amazon.[10]  *Id.* at 2; Winston 11/15/18 Decl. ¶ 5.  Britton's counsel analyzed previous MORs, and determined that Cloudbreak had made a number of American Express and Cobra payments that appeared to have no relation to Cloudbreak's business.  Winston 11/15/18 Decl. ¶ 5.

Indeed, from the Petition Date until Riggs' employment with Amazon was terminated, Cloudbreak's monthly payments to American Express averaged $759.75 per month, with the highest being $4,631.65.[11]  From November 2017 through September 2018, Cloudbreak paid more than $118,031.51 for American Express charges, as set forth in the chart below:

| MONTH | AMERICAN EXPRESS CHARGE | ECF NO. |
|---|---|---|
| November 2017 | $6,530.83 | 302 |
| December 2017 | $0 | 306 |
| January 2018 | $18,341.14 | 316 |
| February 2018 | $2,636.15 | 323 |
| March 2018 | $3,243.21 | 326 |
| April 2018 | $6,724.58 | 337 |
| May 2018 | $8,641.57 | 338 |
| June 2018 | $12,549.57 | 339 |
| July 2018 | $14,047.06 | 345 |
| August 2018 | $14,158.89 | 366 |
| September 2018 | $31,158.51 | 369 |

---

[10]  It was publicly known that Mr. Riggs was employed by Amazon and publicly available media articles indicated his employment was terminated in October 2017.  *See, e.g.*, https://www.hollywoodreporter.com/news/amazon-reality-chief-conrad-riggs-is-1051470.

[11]  It remains unclear why Cloudbreak paid anything on account of the American Express card, which is Riggs' name.

1   Britton's counsel also discovered that in September 2016, Cloudbreak began paying a 25%

2   increase in rent to Bungalow, to $2,500 each month. Winston 11/15/18 Decl. ¶ 6. Cloudbreak never

3   filed a motion to approve this non ordinary course transaction.

4   Britton's counsel prepared a letter to Cloudbreak's counsel seeking additional information

5   about these payments. *Id.*, Ex. A. On October 19, 2018, Cloudbreak's counsel responded, stating that

6   Cloudbreak "reimburses certain expenses incurred by [] Riggs," the American Express payments

7   reflected expenses incurred by Riggs on his personal account, and thus Cloudbreak could not produce

8   any statements supporting why Cloudbreak had made these payments. *Id.*, Ex. B. The email also

9   stated that the rent to Bungalow had increased in September 2016, and that Cloudbreak had no

10  documents concerning the lease or the increased rent. *Id.* Finally, the email admitted that $9,775.14

11  in COBRA payments should not have been made and that Riggs was reimbursing Cloudbreak. *Id.*

12  The email did not, however, explain why Cloudbreak ever made the payments in the first place, or

13  who was supposed to be guarding against unauthorized payments. *See id.*

14  Britton's counsel sent a responsive letter to Cloudbreak's counsel, requesting additional

15  information concerning the lease and American Express payments. *Id.*, Ex. C. On October 30, 2018,

16  Cloudbreak's counsel finally provided a spreadsheet of "business expense payments" from June 2017

17  to October 2018. *Id.*, Ex. D. Those "business expense payments" totaled nearly $118,000, and

18  included:

19      • $10,000 paid to Weintraub & Selth, Riggs' personal counsel, on August 8, 2018.[12]

20      • $5,000 in payments to a travel agent in October 2017.

21      • $3,575 for the Sundance Film Festival in October 2017.

22      • $1,618.96 paid to Ticketmaster on May 2, 2018.

23      • $900 paid to the Rose Bowl on July 27, 2018.

24

25

26  [12]  Cloudbreak paid Riggs' personal counsel the $10,000 the day after Britton and West filed the
27  Joint Plan.  Under these circumstances, it appears that Cloudbreak paid the retainer for its
    shareholder's personal bankruptcy lawyer.  Neither Cloudbreak nor Riggs have explained why
28  Cloudbreak made this payment.  Winston Decl. ¶ 12 & Ex. J.

1
2
- State Bar of California payment in January 2018, which is most likely for Riggs' annual fees as an inactive attorney.

3
4
- Various payments for skiing and entertainment in Colorado in March 2018 and August 2018 and to restaurants in Hawaii in June 2018.

5
6
- Various payments for massages, tennis and racquet clubs, and multiple other fitness related activities.

7
8
*Id.* Cloudbreak's counsel's email further stated that Riggs had agreed to reimburse Cloudbreak $88,907.40, with the remaining amount subject to further review. *Id.*

9
10
11
12
13
Britton's counsel sent yet another letter, asking why $88,907.40 was sufficient to reimburse the estate for all of Riggs' personal expenses in light of the fact that very few charges were actually business related expenses. Winston Decl. ¶ 3 & Ex. A. Cloudbreak's counsel responded that day by e-mail: "*[f]uture* reimbursements will be for business expenses only," thereby acknowledging Cloudbreak had been covering Riggs for non-business expenses. *Id.* ¶ 4 & Ex. B (emphasis added).

14
15
16
17
18
19
20
On November 16, 2018, Cloudbreak's counsel provided evidence that the American Express payments were made from Cloudbreak's accounts. *Id.* ¶ 5 & Ex. C. Britton's counsel then requested copies of the full American Express statements to determine whether Cloudbreak was paying American Express in full or whether some portion was being paid directly by Riggs. *Id.* ¶¶ 6, 8 & Exs. D, F. Cloudbreak refused to turn them over because, despite directly paying American Express, Cloudbreak apparently did not have possession of the full statements - a stunning development. *Id.* ¶¶ 7, 9 & Exs. E, G.

21
22
23
24
25
On December 14, 2018, Riggs' counsel provided redacted American Express statements, which reflect the same transfers as on the spreadsheet. *Id.* ¶ 11 & Ex. I. Importantly, while it appears that Riggs caused Cloudbreak to pay for the vast majority of the charges, there were a few charges that were redacted. This means that Riggs <u>knowingly</u> selected which American Express charges to foist on to Cloudbreak - charges such as paying his personal attorney and multiple vacations.

26
27
28
At bottom, in the space of less than a year, Riggs knowingly took over $100,000 from Cloudbreak to pay for personal expenses. Cloudbreak's professionals, who are the ones who actually file the monthly operating reports, apparently raised no concerns. There was no other fiduciary to put

a stop to Riggs' looting.  Beginning with the MOR filed on November 13, 2018 (reflecting October 2018 activity, the same month in which Britton discovered Riggs' looting), and continuing with the MOR filed on December 17, 2018 (reflecting November 2018), there were no payments to American Express.  *See* ECF 378, 398.

### 8.    The United States Trustee's Motion To Appoint A Chapter 11 Trustee

On December 20, 2018, the UST filed motion to appoint a chapter 11 trustee or, in the alternative, convert this case to chapter 7.  *See* ECF 399.  The UST asserted that a chapter 11 trustee must be appointed because Cloudbreak paid nearly $130,000 to American Express and nearly $10,000 for COBRA health insurance for Riggs' benefit and to the detriment of the bankruptcy estate.  *Id.* at 6-7.  The UST explained that appointment of a fiduciary, rather than dismissal, is necessary because "[i]f the case is dismissed, the full amount of preferential payments will not be brought back into the estate for distribution to creditors, and there will be no opportunity to remedy the harm to the estate that has been caused by [Cloudbreak] and [Riggs]."  *Id.*

Though they slightly differ on the remedy for Riggs' misconduct, Britton fully agrees with the UST that Riggs must be removed as fiduciary.

### 9.    The Status of *Survivor* and *Apprentice*

As indicated above, historically virtually all of Cloudbreak's revenues were derived from *Survivor* and *The Apprentice*.  Unfortunately, by failing to engage in any effort to examine the value of its assets or to attempt to monetize them subject to this Court's supervision, Cloudbreak has likely lost substantial value associated with *The Apprentice*.  Indeed, given the show's longtime association with Donald Trump, there may have been a window of opportunity when Donald Trump was running for election in 2016 to monetize the payment stream, but that has now been lost.

*Survivor* still generates substantial fees.  *See* ECF 367 (Oct. 2, 2018 Tr. at 7:22-8:1) (Cloudbreak's counsel, stating: "Survivor has been picked up for a few more cycles, so there are some receivables on Survivor. Apprentice I don't believe has been picked up, and I think the smart money is that Apprentice is done, at least for the foreseeable future.").  Indeed, Cloudbreak's most recent MOR (reflecting November 2018) indicates that Cloudbreak received a monthly producer fee of over $70,000 attributable to *Survivor* only.  ECF 398 at 20.  *Survivor* remains one of the highest rated

television shows in the lucrative 18-40 demographic, and Britton believes that there is substantial value associated with Cloudbreak's rights relating to *Survivor*.

One of Britton's goals - whether through the Plan or through the appointment of a chapter 11 trustee - is for an independent fiduciary to examine whether Cloudbreak's assets can be monetized, without Riggs squandering such assets.

**10.    The Plan**

Concurrently with the filing of this Motion, Britton has filed the Plan.  The Plan proposes to treat all allowed claims other than the Britton Claim (including Allowed Administrative Claims, Priority Tax Claims, Professional Fee Claims, All Other Priority Claims, Secured Claims, and General Unsecured Claims) as unimpaired, thus paying such clams in full, with postpetition interest, on the effective date.  Plan, Art. V.[13]

All of Cloudbreak's assets, including avoidance actions, will be transferred to a Plan trust, to be administered by an independent Plan Trustee.  *Id.*, Art. VII.B, VIII.  That means the Plan Trustee can investigate and prosecute claims against Riggs, his affiliates, his Self-Settled Trust, and West - which Riggs has previously refused to cause Cloudbreak to do.  Further, any monies received on account of *Survivor* and all rights under the MPB Settlement shall belong to the Plan Trust.  The Plan Trustee will have the exclusive authority to investigate, pursue, and/or settle Causes of Action or objections to Claims, and to transfer, lease, sell, or otherwise transact any assets of the Debtor, except that in the case of the Britton Claim, the Plan Trustee may <u>not</u> settle with Britton absent approval of this Court after notice and opportunity to object.  *Id.*, Art. VII.E.  Britton will have no say over whether the Plan Trustee decides to litigate against Britton.

Under the Plan, after payment of allowed claims and funding for the Plan Trustee's expenses (including a budget for Cloudbreak to litigate against Britton), a $2.5 million initial reserve will be established for the Britton Claim.  *Id.*, Art. VII.C.  As money is received by the Plan Trust on account

---

[13] Under the Plan, only creditors who timely filed proofs of claim can hold allowed claims.  For avoidance of doubt, Riggs will not receive anything on account of any claim he may have against Cloudbreak because he did not file (much less timely file) a proof of claim.

1  of the assets owned by the Plan Trust, a portion of such money, after paying for budgeted expenses,

2  will be added to the Britton Claim reserve, up to $27.4 million. *Id.*

3  In exchange for Cloudbreak transferring its assets to the Plan Trust, Cloudbreak receives a

4  beneficial interest in the Plan Trust. If and when the Britton Claim is resolved (either because it has

5  been disallowed or because it has been paid in full by the Plan Trust) any excess value reverts back to

6  Cloudbreak and the Plan Trust will at that stage take steps to dissolve.

7  The Plan provides that Riggs keeps all of his equity interests in Cloudbreak, with the full rights

8  of a shareholder, and thus is unimpaired under the Plan.

9  **III.    REQUEST FOR CONFIRMATION OF THE PLAN**

10  Britton requests that the Court confirm the Plan. The Plan meets all the confirmation

11  requirements of 11 U.S.C. § 1129 and ensures that, except Britton, all creditors holding allowed

12  claims and Riggs' equity interests are unimpaired, while preserving the parties' rights in the State

13  Court Litigation.

14  **A.    A Separate Disclosure Statement Is Not Required**

15  Britton is not submitting a disclosure statement to accompany the Plan. Pursuant to 11 U.S.C.

16  § 105(d)(2)(B)(iv), the Court may combine the hearing on approval of the disclosure statement with

17  the hearing on confirmation of a plan. Courts do not require a separate disclosure statement when all

18  classes are unimpaired under a plan. *In re Amster Yard Assocs.*, 214 B.R. 122, 123 n.5 (Bankr.

19  S.D.N.Y. 1997) ("If all classes are unimpaired and no solicitation is required, the court does not have

20  to approve a disclosure statement prior to confirmation, if ever."); *see In re Gulf Coast Oil Corp.*, 404

21  B.R. 407, 425 (Bankr. S.D. Tex. 2009) ("[T]he Bankruptcy Code explicitly authorizes a plan

22  proponent to use a single document to satisfy the requirements of both the plan and the disclosure

23  statement . . . and authorizes a single hearing both to approve the disclosure statement and to rule on

24  plan confirmation.").

25  Courts also do not require a separate disclosure statement where the only impaired party is the

26  plan proponent. *In re Colony Props. Int'l, LLC*, 2011 WL 4443319, at *1, *2 (Bankr. S.D. Cal. Sept.

27  19, 2011) ("Under the terms of the joint plan . . . general unsecured creditors will be paid in full and

28  are unimpaired, and thus are presumed to have accepted the plan. Conversely, the equity holders will

1    receive nothing, and are deemed to have rejected.  Finally, KBR is impaired, but as plan proponent

2    accepts the plan. Accordingly, the Court finds that the lack of disclosure statement in this case is not a

3    bar to confirmation."); *see Amster Yard*, 214 B.R. at 123 n.5.

4           Here, the only impaired class is Class 4, and the only claim in that class is the Britton Claim.

5    Britton is the plan proponent, and thus has necessarily accepted the Plan.  *Colony Props.*, 2011 WL

6    4443319, at *2 ("KBR is impaired, but as plan proponent accepts the plan.").  All other creditors are

7    unimpaired and thus are deemed to have accepted the Plan.  11 U.S.C. § 1126(f).[14]

8           Additionally, no financial disclosures, beyond the monthly operating reports, are necessary.

9    Cloudbreak has sufficient funds to pay all claims treated in the Plan, other than Britton, in full on the

10   effective date.  *In re Arnold & Baker Farms,* 177 B.R. 648, 659 (B.A.P. 9th Cir. 1994), *aff'd*, 85 F.3d

11   1415 (9th Cir. 1996) (liquidation analysis not necessary in disclosure statement because plan paid

12   objecting party's claim in full); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 331 (Bankr. E.D. Pa.

13   1987) (liquidation analysis in disclosure statement unnecessary because debtors' balance sheet and

14   monthly operating reports provided necessary information).  According to its most recent monthly

15   operating report, Cloudbreak has over $3.5 million in unrestricted cash as of November 30, 2018.

16   ECF 398 at 17.  That is more than sufficient cash to pay all administrative expenses, claims in Class 3,

17   and operating expenses for the Plan Trust.  Thus, in these circumstances, a disclosure statement is

18   unnecessary.

19          Cloudbreak and Riggs will likely argue that a disclosure statement is required because Class

20   5—consisting of Riggs' equity interests—is impaired.  They are wrong.  Although the Plan transfers

21   Cloudbreak's assets to the Plan Trust, the Plan does not alter in any way Riggs' equity interests.

22   Bankruptcy courts routinely recognize that although a stockholder has an interest in the company, it

23   has no interests in assets owned by the company.  *See In re Calvert*, 135 B.R. 398, 401 (Bankr. S.D.

24   Cal. 1991) ("Although a debtor owns 100 percent of the stock of a corporation, the property interest of

25

26          [14]  The Plan provides no treatment for the West Claim because West has sought to withdraw her
     proof of claim.  Although the withdrawal of the West Claim is not effective absent Court order, and a
27   Court order has not been entered as of the date of the filing of this Motion, Britton does not oppose the
     withdrawal, subject to the conditions laid out in the Rule 3006 Motion.
28

1  the debtor's bankruptcy estate extends only to the intangible personal property rights represented by

2  the stock certificates."); *Fowler v. Shadel*, 400 F.3d 1016, 1019 (7th Cir. 2005) ("Bankruptcy courts . .

3  . have [] held that corporate assets cannot become part of the bankruptcy estate of the debtor

4  shareholder.").

5          Under the Plan, Riggs retains all of his rights as a shareholder.  He still has a right to vote his

6  shares, appoint board members of Cloudbreak, and receive distributions from Cloudbreak.  Because

7  the Plan does not alter any of Riggs' rights, Class 5 is unimpaired.  *In re Nickels Midway Pier, LLC,*

8  452 B.R. 156, 164 (D. N.J. 2011) (equity holder unimpaired where the plan provided that "property of

9  the estate will remain property of the estate rather than revesting in the Debtor, and the Plan

10  Administrator will manage the estate" because the plan did not "alter the Nickels Brothers' 'legal,

11  equitable [or] contractual rights' . . . *as equity holders*") (emphasis added).

12      **B.      The Plan Satisfies Each Confirmation Requirement Of Section 1129 Of The**

13              **Bankruptcy Code**

14          Bankruptcy Code section 1129(a) provides that the Court shall confirm a chapter 11 plan when

15  each of the statute's applicable sixteen subsections have been satisfied.  As described below, the Plan

16  satisfies every one of the applicable subsections of Bankruptcy Code § 1129(a).  And, even if the Plan

17  does not satisfy § 1129(a)(8), the Plan may be confirmed under § 1129(b).

18      **1.      The Plan Complies With The Applicable Provisions Of Title 11 (11 U.S.C. §**
                **1129(a)(1))**
19
20          Bankruptcy Code section 1129(a)(1) requires that a plan "compl[y] with the applicable

21  provisions of this title."  This subsection embodies and incorporates the requirements of Bankruptcy

22  Code sections 1122 and 1123, which govern the classification of claims and interests and the

23  mandatory contents of a plan.  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977).  As explained

24  below, the Plan complies with Bankruptcy Code sections 1122 and 1123, and with all other applicable

25  provisions of the Bankruptcy Code, and thus satisfies section 1129(a)(1).

26      **a.      The Plan Satisfies The Classification Requirements Of The Bankruptcy**
                **Code (11 U.S.C. § 1122)**

27          Bankruptcy Code section 1122 states that "a plan may place a claim or interest in a particular

28  class only if such claim or interest is substantially similar to other claims or interests of such class."

By its plain language, section 1122 prohibits only the classification of dissimilar claims into the same class.  *See* Alan J. Resnick, *et al.*, 7 COLLIER ON BANKRUPTCY ¶ 1122.03[1] (16th ed. rev. 2015). Courts have broad discretion to determine appropriate classification schemes in light of the facts of each case.  *Steelcase Inc. v. Johnston* (*In re Johnston*), 21 F.3d 323, 327 (9th Cir. 1994).

Here, Article V of the Plan places claims in four different classes, and interests in the final class.  There are only five classes and each claim or interest placed in a particular class is substantially similar to the other claims or interests in that class.  Therefore, the Plan satisfies § 1122.

### b.    The Plan Satisfies The Mandatory Plan Requirements Of 11 U.S.C. § 1123(a)(1)-(7)

Bankruptcy Code section 1123(a) lists eight mandatory requirements for chapter 11 plans.  As demonstrated below, the Plan complies with all the requirements of § 1123(a).

*First*, section 1123(a)(1) requires that a chapter 11 plan designate classes of claims and interests other than claims of a kind specified in §§ 507(a)(2) (administrative expense claims), 507(a)(3) (involuntary bankruptcy "gap" period claims), and 507(a)(8) (priority tax claims).  Article V of the Plan expressly classifies all claims other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims.

*Second*, section 1123(a)(2) requires that the plan "specify any class of claims or interests that is not impaired under the plan."  Article V of the Plan specifies that all classes of claims and interests are not impaired except for Class 4 (the Britton Claim).

*Third*, section 1123(a)(3) requires that the plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan satisfies this requirement by specifying the treatment of Class 4 (the Britton Claim).  Plan, Art. V.

*Fourth*, section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class . . . ."  Article V of the Plan satisfies this requirement by providing the same treatment to each claim that is classified in a particular class.

*Fifth*, section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of adequate means, such as "transfer or all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of

1    such plan." 11 U.S.C. § 1123(a)(5)(B).  The Plan satisfies this requirement.  It explains that all claims

2    other than the Britton Claim will be paid in full from cash on hand on the effective date.  Plan, Art.

3    VII.C.  And it transfers Cloudbreak's assets to the Plan Trust, which will administer those assets

4    pursuant to the Plan and Plan Trust Agreement.  *Id.*, Art. VII.B.

5        *Sixth*, section 1123(a)(6) requires that a plan provide for the inclusion in the charter of a

6    reorganized debtor a provision prohibiting the issuance of non-voting equity securities, and, if

7    necessary, providing protections for holders of preferred shares.  The Plan satisfies this requirement

8    because the Plan does not alter the equity securities of Cloudbreak.  Plan, Art. V.G, VII.A.

9        *Seventh*, section 1123(a)(7) requires that a plan "contain only provisions that are consistent

10   with the interests of creditors and equity security holders and with public policy with respect to the

11   manner of selection of any officer, director, or trustee under the plan and any successor to such

12   officer, director, or trustee."  The Plan and the Plan Trust Agreement satisfy this requirement.  The

13   creation of the Plan Trust is consistent with the interests of creditors and equity security holders

14   because it will ensure that Riggs will not abscond with Cloudbreak's assets, while providing that

15   Riggs will retain his equity interests in Cloudbreak and that Cloudbreak's assets will revest in

16   Cloudbreak following consummation of the Plan.  Plan, Art. VII.C.  The Plan also identifies Peter

17   Kravitz as the trustee of the Plan Trust, references his qualifications, and provides procedures for

18   removal and the nomination of a successor.  *Id.*, Art. VII.D; *see* Plan Trust Agreement.[15]

19       *Last*, section 1123(a)(8) is inapplicable because it is limited to individual debtor cases.

20       **c.    The Plan's Salient Features Are Authorized By 11 U.S.C. § 1123(b)**

21       Bankruptcy Code section 1123(b) sets forth various provisions that may, but are not required

22   to be, included in a chapter 11 plan.  Among other things, section 1123(b) allows a plan to provide for

23   "the settlement of adjustment of any claim or interest belonging to the estate," "the retention and

24   enforcement . . . by a representative of the estate . . . of any such claim or interest," and "any other

25   appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. §

26   1123(b)(3), (6).  Section 1123(b) is intended to be a broad grant of authority.  *United States v. Energy*

27   
28       [15]   Britton will file the Plan Trust Agreement in a Plan Supplement.

*Resources Co., Inc.*, 495 U.S. 545, 549 (1990) ("bankruptcy courts [have] residual authority to approve [] plans including any appropriate provision not inconsistent with the applicable provisions of this title") (internal quotations omitted).  The Plan contains several permissive provisions, all of which are intended to facilitate prompt administration of assets and adjudication of claims.

### (i)    The Plan Trust

The Plan provides for the creation of a Plan Trust, to be administered by the Plan Trustee.  Plan, Art. VII.B.  All of Cloudbreak's assets, including any rights in, to, or relating to the MBP Settlement Agreement and the Survivor Cash Flow will vest in the Plan Trust.  *Id.*  The Plan Trust will administer and hold Cloudbreak's assets, including Causes of Action, in accordance with the Plan.  *Id.*

Numerous courts hold that the creation of such a Plan Trust is authorized under § 1123(b).  *Search Market Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1191 (10th Cir. 2012) (liquidating trustee is a "representative of the estate" under § 1123(b)(3)); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180 n.1 (11th Cir. 1987) (creditor trustee is a "representative of the estate" under § 1123(b)(3)); *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 341 (S.D. Fla. 1986) (appointing plan trustee proposed in creditor plan that would oversee debtors' operations, effectuate the plan, and take over the debtors' civil action against the creditor to effectuate its dismissal).

The only requirements for appointment of such a representative are that appointment be approved by the Court, and that it "benefit the debtor's estate and particularly, the debtor's unsecured creditors." *Paige*, 685 F.3d at 1191.  Here, the appointment of a Plan Trustee is not only beneficial to the estate, but is necessary to preserve estate assets.  A Plan Trustee will dispassionately examine Cloudbreak's assets to determine whether they can be monetized and investigate claims against Riggs, West and others without improper interference or influence.  Similarly, the Plan Trustee will be an independent fiduciary who will be prepared and able to continue defending against the Britton Claim.

### (ii)    Assumption And Rejection Of Contracts

As permitted by section 1123(b)(2), Article X.B of the Plan provides for the assumption and/or rejection of Cloudbreak's remaining executory contracts and unexpired leases.  Specifically, all executory contracts and unexpired leases are rejected, with one exception: to the extent that MPB

Settlement Agreement is determined to be an "executory contract," it is not rejected but will "ride through" unaffected. *See id.*[16]

### (iii)    **Retention Of Jurisdiction**

Under Article X.J of the Plan, the Court shall retain jurisdiction to the fullest extent provided by law, including to hear and determine any dispute arising under the Plan or its implementation, to hear and determine the Causes of Action, and to approve any settlement of the State Court Litigation. This provision is permitted by § 1123(b).

### 2.    **The Plan Proponent Has Complied With The Applicable Provisions Of The Bankruptcy Code (11 U.S.C. § 1129(a)(2))**

Bankruptcy Code section 1129(a)(2) requires that the plan proponent "compl[y] with the applicable provisions of this title." The primary purpose of this subsection is to ensure that the plan proponent complies with the Bankruptcy Code's requirements regarding solicitation. *In re Art and Architecture Books of the 21st Century*, 2016 WL 1118743, at *14 (Bankr. C.D. Cal. Mar. 18, 2016); *see In re Texaco, Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).

Here, solicitation is not required because all classes other than Class 4 (Britton Claim) are unimpaired and thus deemed to have accepted the Plan. Britton holds the only impaired claim under the Plan, and as the plan proponent, necessarily accepts the Plan. Thus, Britton has satisfied the requirements of § 1129(a)(2). *Colony Props.*, 2011 WL 4443319, at *1, *2.

### 3.    **The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law (11 U.S.C. § 1129(a)(3))**

Bankruptcy Code section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." The Bankruptcy Code does not define "good faith," but the Ninth Circuit has held that a plan is proposed in good faith if it "achieves a result consistent with the objectives and purposes of the Code." *Art and Architecture*, 2016 WL 1118743, at *15 (citing *In re Sylmar Plaza,L.P.,* 314 F.3d 1070, 1075 (9th Cir. 2002)). Good faith is determined "in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan." *Id.* "Good faith

---

[16]    The only known lease is the oral month-to-month lease with Bungalow. To the extent it is an unexpired lease within the meaning of Bankruptcy Code section 365, it is rejected.

1  requires . . . a fundamental fairness in dealing with one's creditors." *Art and Architecture*, 2016 WL

2  1118743, at *14 (citing *In re Stolrow's, Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988)).

3        Here, the Plan was proposed in good faith. It ameliorates any concern that Cloudbreak's assets

4  will be absconded with or otherwise used for improper purposes by placing such assets under the

5  control of an independent Plan Trustee. This allows for a fiduciary to monitor the Plan Trust assets

6  and thus demonstrates "fundamental fairness in dealing with one's creditors" and provides the best

7  means of maximizing recovery to creditors. *Art and Architecture*, 2016 WL 1118743, at *14 (citing

8  *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997)). Further, Britton has complied with

9  all court orders, and has pursued a course of action that would ensure all creditor's rights are

10  preserved notwithstanding Riggs' and Cloudbreak's dereliction of their fiduciary duties. *Art and*

11  *Architecture*, 2016 WL 1118743, at *14 (stating that courts consider whether the plan proponent has

12  abided by court orders). In addition, the Plan is not proposed for any purpose prohibited by law.

13        Riggs and Cloudbreak will undoubtedly argue that the Plan has been proposed in bad faith

14  because it gives the Plan Trustee authority to settle or compromise claims, including the Britton

15  Claim. That argument has no basis in reality. *First*, Britton has proposed an experienced and well-

16  regarded professional fiduciary to serve as the Plan Trustee. Mr. Kravitz has been appointed as a

17  liquidating trustee, litigation trustee, and creditor trustee in numerous cases both in this district and

18  nationally.[17] *Second*, the Plan Trust does not have an indefinite duration. It's initial term is for five

19  years, and it ensures that valuable avoidance claims will examined and if appropriate, pursued. *Third*,

20  the Plan Trust does not prejudice Riggs in the State Court Litigation. In fact, the Plan Trust does not

21  impact his ability to consult with counsel, prosecute claims he feels appropriate, and defend against

22  Britton's claims as he feels appropriate.[18] *Last*, any concerns that the Plan Trustee will not defend the

---

24  [17]  One of the reasons that Britton's counsel suggested Mr. Kravitz to Cloudbreak's counsel is

25  because both Britton's and Cloudbreak's counsel have worked with Mr. Kravitz on numerous
unrelated matters, and no doubt would agree that he is well-qualified. To the extent the Court has any

26  concerns with Mr. Kravitz, Britton is open to any process that would result in a qualified, independent
Plan Trustee being appointed.

27  [18]  The only "prejudice" to Riggs will be that he will no longer to use Cloudbreak's assets to

28  enrich himself at the expense of Cloudbreak's creditors.

---

State Court Litigation are misplaced. The Plan Trustee is tasked with fiduciary duties, and the Court

will retain oversight and approval of a litigation budget. Britton expects that after reserves are filled,

the vast majority of cash receipts will be used to pursue litigation against both Britton and Riggs.

**4.    The Plan Provides For Required Bankruptcy Court Approval Of Certain Administrative Payments (11 U.S.C. § 1129(a)(4))**

Bankruptcy Code section 1129(a)(4) stated that "[a]ny payment made or to be made by the

[plan] proponent, by the debtor, or by a person issuing securities or acquiring property under the plan,

for services or for costs and expenses in or in connection with the case, or in connection with the plan

and incident to the case," be approved by the Court as reasonable." *See In re Resorts Int'l, Inc.*, 145

B.R. 412, 475-76 (Bankr. D.N.J. 1990) (section 1129(a)(4) satisfied where plan provided all payments

to professionals subject to final approval by the Court).

The Plan provides that Professional Fee Claims will only be paid to the extent they become

Allowed Administrative Claims, and require proper applications before holders receive any

distributions. Plan, Art. V.B. The Plan therefore complies with § 1129(a)(4).

**5.    The Plan Trustee's Identity Has Been Disclosed And His Appointment Is Consistent With Public Policy (11 U.S.C. § 1129(a)(5))**

Bankruptcy Code section 1129(a)(5) requires that: (i) the plan proponent disclose the identity

and affiliations of any individual proposed to serve after confirmation as a director, officer, or voting

trustee of the debtor; (ii) the appointment or continuance in office of such individuals be consistent

with the interests of creditors and shareholders and with public policy; and (iii) that the proponent

disclose the identity of any insider that will be employed or retained by the reorganized debtor and the

nature of the compensation to be provided to such insider.

Here, as an initial matter, section 1129(a)(5) is inapplicable because the Plan Trustee is not a

"director, officer, or voting trustee of the debtor." *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 308

(Bankr. N.D. Ill. 2008) ("Neither the Liquidation Trustee nor the Liquidation Trust Committee

constitutes an individual who would serve as a director, officer, or voting trustee of Sentinel."); 

*Packard v. Cooper*, 2008 WL 4926962, at *5 (C.D. Cal. Nov. 13, 2008) ("Appellants make a more

pointed argument that the Plan fails to comply with section 1129(a)(5)(A)(i)'s disclosure requirements

because two of the individuals who will serve on the Trust board—one an unnamed person

representing and selected by HP, one an unnamed person representing and selected jointly by KDB and NACF—were not disclosed. It is clear from the face of the statute, however, that there is no requirement that the identity and affiliations of Trust board members be disclosed."). Further, the Plan provides that holders of equity interests will retain their interests—thus, it is no stretch that Riggs will remain the sole director and president of reorganized Cloudbreak, but that is for Riggs to decide.

To the extent that § 1129(a)(5) applies, the Plan discloses the identity of the Plan Trustee, and there can be no dispute that his appointment is consistent with the interests of creditors, shareholders, and public policy. Plan, Art. VII.D. As explained above, the Plan Trustee will ensure that Riggs does not dissipate Cloudbreak's assets to enrich himself at the expense of creditors, but will also preserve Riggs' rights to defend himself in the State Court Litigation. The Plan also discloses the Plan Trustee's compensation. *Id.*, Art. VII.D; *see* Plan Trust Agreement. The Plan therefore complies with § 1129(a)(5).

### 6. 11 U.S.C. § 1129(a)(6) Is Not Applicable.

Bankruptcy Code section 1129(a)(6) is inapplicable because Cloudbreak is not subject to any rate regulations and the Plan does not propose any rate changes.

### 7. The Plan Is In The Best Interests Of Creditors And Interest Holders (11 U.S.C. § 1129(a)(7))

Bankruptcy Code section 1129(a)(7)(A), commonly referred to as the "best interests test", requires that with respect to each class of impaired claims either accept the plan, or receive or retain property of a value, as of the effective date of the plan, that is not less than such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[19]

Here, the only impaired class is Class 4, which only contains Britton Claim. Because Britton is the plan proponent, he has necessarily accepted the Plan. Thus, the requirements of section 1129(a)(7) are satisfied.

Even if other classes had been impaired, section 1129(a)(7) is still satisfied. All classes above Class 4 will receive full payment on their claims, and therefore, necessarily will receive at least much

---

[19] Bankruptcy Code section 1129(a)(7)(B) is inapplicable here because no election has been made under § 1111(b).

as they would under a chapter 7 liquidation.  And, Riggs will likely receive more under the Plan than he would in a liquidation.  In a chapter 7 liquidation, Cloudbreak (and by extension, Riggs) could not receive any payments unless and until the Britton Claim was (a) either allowed or disallowed and (b) if allowed, paid in full.  *See* 11 U.S.C. § 726(a).  There would also be additional administrative expenses and potentially more proofs of claim that could be filed against Cloudbreak.

Unless Britton *loses* the "money had and received" claim (with a principal amount in excess of $9 million), which is a dubious prospect, it is extremely unlikely that Riggs would receive any payments on account of his equity interests.  Under the Plan, however, Riggs will retain his equity interests unaltered, and after the Plan Trust fulfills its obligations, assets will revest in the Reorganized Debtor.  Thus, Riggs is receiving more than he would in a chapter 7 liquidation.[20]

### 8. The Only Impaired Class (Britton) Has Accepted The Plan (11 U.S.C. § 1129(a)(8))

Bankruptcy Code section 1129(a)(8) requires that each class of claims and interests either accept the plan or not be impaired under the plan.  A class of claims that is not impaired is deemed to have accepted the plan. 11 U.S.C. § 1126(f).  Here, as explained above, all classes other than Class 4 (Britton Claim) are unimpaired, and thus, are deemed to have accepted the Plan.  Britton is the plan proponent, and thus, Class 4 has accepted the Plan.  Therefore, § 1129(a)(8) is satisfied.

### 9. The Plan Complies With Statutorily Mandated Treatment Of Administrative And Priority Tax Claims (11 U.S.C. § 1129(a)(9))

Bankruptcy Code section 1129(a)(10) provides that unless the holder of a claim agrees to different treatment of its claim, the holder of a: (A) § 507(a)(2) or (3) claim must receive cash equal to the allowed amount of its claim on the effective date; (B) § 507(a)(1), (4), (5), (6), or (7) claim must receive either cash equal to the allowed amount of the claim on the effective date, or deferred cash payments of a value, on the effective date, equal to the allowed amount of such claim; (C) § 507(a)(8) claim must receive regular installment payments in cash of a total value, as of the effective date, equal to the allowed amount of such claim, over a period ending not later than 5 years after the date of the

---

[20]    At a minimum, Riggs will receive at least as much under the Plan and in a chapter 7 liquidation, because in both cases, he would retain his equity interests.

1   order for relief, and in a manner not less favorable than the most favored nonpriority unsecured claim

2   provided for in the plan; and (D) secured tax claim, which if unsecured would be entitled to priority

3   under § 507(a)(8), must also receive cash payments as prescribed in § 1129(a)(10)(C).

4          The Plan satisfies the requirements of § 1129(a)(9).  It provides for payment in full on the

5   Effective Date of all Allowed Administrative Claims, Priority Tax Claims, Professional Fee Claims,

6   and all Other Priority Claims.

7          **10.    <u>The Only Impaired Class Has Accepted The Plan (11 U.S.C. § 1129(a)(10))</u>**

8          Bankruptcy Code section 1129(a)(10) requires that at least one class of claims that is impaired

9   under the plan has voted to accept the plan, without including the acceptance of the plan by an insider.

10  The only impaired Class is Class 4 (Britton Claim), and as plan proponent, Britton has accepted.

11         **11.    <u>The Plan Is Feasible (11 U.S.C. § 1129(a)(11))</u>**

12         Pursuant to § 1129(a)(11), the Court must find that "[c]onfirmation of the plan is not likely to

13  be followed by the liquidation, or the need for further financial reorganization, of the debtor or any

14  successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the

15  plan." *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("The purpose behind

16  the statutory requirement of feasibility is to prevent confirmation of visionary schemes which promise

17  creditors and equity security holders more under a proposed plan than the debtor can possibly attain

18  after confirmation.") (internal quotations omitted).

19         Here, the Plan provides for payment in full with post-petition interest from cash on hand to all

20  creditors other than Britton.  Doing so is certainly feasible, given that Cloudbreak had over $3.5

21  million in unrestricted cash as of November 30, 2018. ECF 398 at 17.  The source of these payments

22  is not subject to any dispute, uncertainty or contingency.  After payment of all claims other than

23  Britton, cash flow will be used to fund the reserves, and operating expenses of the Plan Trust, as

24  specified in in the waterfall laid out in the Plan Art. VII.C.  Any remaining funds and assets will revest

25  in reorganized Cloudbreak.  *Id.*  Because the Plan pays all claims in full and provides a mechanism for

26  distribution on account of the Britton Claim if and when the Britton Claims becomes an allowed

27  claim, confirmation will not be followed by a need for further reorganization.  The Plan therefore

28  satisfies § 1129(a)(11).

**12.    The Plan Provides For Payment Of All Fees Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12))**

Bankruptcy Code section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930 be paid on or before the effective date of the plan.  Article X.D of the Plan provides that such fees will be paid from Available Cash on the Effective Date.

**13.    11 U.S.C. § 1129(a)(13)-(16) Are Not Applicable**

Bankruptcy Code section 1129(a)(13) is not applicable to Cloudbreak because Cloudbreak has no retiree benefits within the meaning of this subsection.  Bankruptcy Code sections 1129(a)(14) and (15) are only applicable to individual debtors.  Bankruptcy Code section 1129(a)(16) applies only to a debtor that is not a moneyed, business, or commercial corporation or trust.

**14.    The Plan Satisfies 11 U.S.C. § 1129(b)**

As noted above, the Plan satisfies the requirements of § 1129(a)(8), and therefore, § 1129(b) is inapplicable.  To the extent that the Court determines that Class 5 (Equity Interests) is impaired and has not accepted the Plan, Britton requests confirmation under § 1129(b) with respect to that class.

Bankruptcy Code section 1129(b) provides that, when all of the applicable requirements to confirm a plan other than § 1129(a)(8) have been met, the Court may confirm the plan if it does not discriminate unfairly and is fair and equitable with respect to each class that is impaired and has not accepted the plan. 11 U.S.C. § 1129(b). As explained below, the Plan does not discriminate unfairly and provides fair and equitable treatment with respect to Class 5.

**a.    The Plan Does Not Discriminate Unfairly**

Bankruptcy Code section 1129(b)(1) requires that a dissenting class receive "treatment which allocates value to the [dissenting] class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor."  *In re Mcorp Fin., Inc.*, 137 B.R. 219, 234 (Bankr. S.D. Tex. 1992), *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex. 1992).  The dissenting class must "receive relative value equal to the value given to all other similarly situated classes" *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).  There are no classes similarly situated to Class 5, which consists of Equity Interests.  Thus, the Plan does not discriminate, unfairly or otherwise, against Class 5.

**b.    The Plan Is Fair And Equitable**

A plan is fair and equitable with respect to a class of equity holders if "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."   11 U.S.C. § 1129(b)(2)(C)(ii).   The Plan satisfies § 1129(b)(2)(C)(ii) because no claimholders or interest holders junior to Class 5 will receive or retain any property under the Plan.

**C.    <u>The Plan Better Serves The Interests Of All Parties And The Purposes Of The Bankruptcy Code</u>**

Bankruptcy Code section 1129(c) states that "the court may confirm only one plan" and that if confirmation requirements are met with respect to more than one plan, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

Cloudbreak has indicated that it may seek confirmation of its amended plan filed on October 2, 2018.   If Cloudbreak does proceed, Britton will show that the plan is unconfirmable for multiple reasons.   But even if the Court were to consider "the preferences of creditors and equity security holders," it would not make a difference, because such preferences and sound policy require confirmation of the Plan.   *See, e.g.*, *In re River Village Assocs.*, 181 B.R. 795, 807 (E.D. Pa. 1995) (confirming creditor's plan over debtor's plan because, among other things, "creditors would prefer a plan which leaves them financially whole").

The Plan provides for payment in full to all other creditors other than Britton, preserves all of the parties' litigation rights, protects estate assets and valuable avoidance claims, *and* leaves Riggs' equity interests unaltered.   Importantly, it puts in place an independent fiduciary.   This situation is far preferable to Cloudbreak's amended plan, which provides Riggs carte blanche to continue looting Cloudbreak to the detriment of Cloudbreak's creditors and does nothing to ensure that the Britton Claim has any possibility of being paid in full.

**IV.    <u>BRITTON'S ALTERNATIVE REQUEST FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>**

In the event that the Court does not confirm the Plan, Cloudbreak's and Riggs' conduct warrant the appointment of a chapter 11 trustee.   Not only has Riggs looted Cloudbreak's assets, he

Case No. 2:15-bk-28443-NB
MEMORANDUM OF POINTS AND AUTHORITIES

has also entered into the undisclosed West/Riggs Transaction, which appears designed to induce West to take certain actions in the bankruptcy, including withdrawing her proof of claim.  Further, Cloudbreak has made outside of the ordinary course transactions with a Riggs' controlled entity without any disclosure or required court approval.  And Riggs has sat idle as Cloudbreak's estate lost opportunities to monetize its assets such as *The Apprentice*.

Bankruptcy Code section 1104(a)(1) states that "the court shall order the appointment of a trustee . . . for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause . . . ."  *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (§ 1104(a)(1) does not "promulgate an exclusive list of causes for which a trustee must be appointed") Cloudbreak's and Riggs' conduct in this case more than satisfies the standards for appointing a chapter 11 trustee.  There are at least four separate grounds to appoint a trustee.

A debtor-in-possession "stands in a fiduciary relationship to his creditors."  *In re Woodson*, 839 F.2d 610, 614 (9th Cir. 1988).  "[A]s representative of the estate, [it] occupies a trust relationship subject to fiduciary obligations which include a prohibition against self-dealing."  *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) A debtor-in-possession's job is to "get the creditors paid" and its "fiduciary obligations to its creditors include[ ] refraining from acting in a manner which could damage the estate . . . ."  *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990).

When, as Riggs has done here, a debtor in possession utterly fails to discharge fiduciary duties, the appointment of a chapter 11 trustee is the appropriate remedy.  The Ninth Circuit and other courts within this Circuit have repeatedly appointed chapter 11 trustees for conduct that is similar to what Riggs has done here.

### 1.    The Looting Of Corporate Assets Requires Appointment Of A Trustee

As explained above, in the space of ten months, Cloudbreak made nearly $118,000 in payments to American Express for alleged "business expense payments" as well as nearly $10,000 in COBRA payments for Riggs' personal benefit.  Those payments included thousands of dollars for travel agents, film festivals, massages, retail clothing, restaurants in Hawaii, and skiing in Colorado.

1    These payments, without more, are sufficient to appoint a chapter 11 trustee. *See, e.g.*, *In re Bibo,*

2    *Inc.*, 76 F.3d 256, 257-58 (9th Cir. 1996) (cause to appoint trustee where owner of debtor-in-

3    possession was siphoning money from the estate); *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 385

4    (Bankr. D. Del. 2001) ("Diversion of funds and misuse of corporate assets constitute fraud or

5    dishonesty sufficient to warrant appointment of a trustee . . . ."); *In re Colby Constr. Corp.*, 51 B.R.

6    113, 117 (Bankr. S.D.N.Y. 1985) (trustee appointed where insider depleted debtor's assets to pay

7    membership dues at clubs and for a Christmas party).

8          Cloudbreak's and Riggs' explanations for these payments have not alleviated, but heightened,

9    the concerns that Riggs cannot be trusted with managing Cloudbreak.  Cloudbreak's counsel's

10   October 30, 2018 e-mail indicated that Riggs had agreed to reimburse Cloudbreak $88,907.40, but

11   provided no explanation as to which charges were personal expenses, and which charges were

12   business expenses.  Winston 11/15/18 Decl., ¶ 8 & Ex. C.  Cloudbreak's counsel later stated that

13   "*[f]uture* reimbursements will be for business expenses only," thus acknowledging Cloudbreak had

14   made payments for non-business expenses.  Winston Decl. ¶ 4 & Ex. B.

15         But Riggs' counsel then indicated that the charges on the excel spreadsheet of American

16   Express charges were not Riggs' personal expenses, *id.* ¶ 10 & Ex. H, despite the fact that Riggs had

17   allegedly agreed to pay back over $88,000 of those payments.  It is apparent that Riggs is unilaterally

18   deciding which expenses are "personal" and which are "business," without any meaningful analysis.

19        **2.    The Non-Ordinary Course Dealings Between Cloudbreak And Bungalow Support**
              **The Appointment Of A Chapter 11 Trustee**

20

21         Since the commencement of the case, Cloudbreak had been paying $2,000 a month to

22   Bungalow based on an alleged oral, month-to-month lease, of which there is no documentation.

23   Winston 11/15/18 Decl. ¶ 8 & Ex. B.  It is unclear why Cloudbreak needs any physical space (let

      alone at a residential property), considering it has no operations and no employees.  Bungalow is
24
      owned by Riggs, which means Cloudbreak's cash is being used to pay Riggs.  The only explanation
25
      has been that the space was needed to store "litigation records."  *Id.*, Ex. D.  It is not clear why
26
      Cloudbreak needs to pay $24,000 a year (to an insider) to store "litigation records."
27

28

Even more troubling, Bungalow and Cloudbreak allegedly agreed to increase rent to $2,500 in September 2016. *Id.*, Ex. B. A 25% increase (from $2,000 a month to $2,500), on a clearly non-arm's length basis, is undoubtedly outside the ordinary course of business and should have been subject to notice and hearing under 11 U.S.C. § 363(b). Yet Cloudbreak never sought court approval for this large increase in monthly rent. Thus, in addition to looting assets, Cloudbreak has violated the Bankruptcy Code. *In re North*, 212 F. App'x 626 (9th Cir. 2006) (failure to comply with the bankruptcy code is cause to appoint a trustee, it is in the best interests of creditors "to have an independent and disinterested trustee to administer the estate," and the fact that the debtor "is a lawyer makes his conduct especially inexcusable"); *In re Grasso*, 490 B.R. 500, 519 (Bankr. E.D. Pa. 2013) (violation of § 363(b) is cause to appoint a chapter 11 trustee).

### 3. The Undisclosed West/Riggs Transaction Warrants The Appointment Of A Trustee

The failure to disclose the West/Riggs Transaction is further troubling. As explained in the Rule 3006 Motion, there is a legitimate concern that Riggs sought to undermine the Joint Plan so that he could remain in control of Cloudbreak's assets. Removing West as a Joint Plan Proponent would allow him to argue that the case was now a two-party dispute and should be dismissed. Indeed, he took that exact position before the Court the day after the existence of the West/Riggs Transaction was disclosed to Britton. ECF 379 (Nov. 6, 2018 Tr. at 7:6-13).[21]

Although the lack of disclosure may stave off claims for breach of fiduciary duty or potential criminal referrals for the time being, it cannot prevent the appointment of a chapter 11 trustee. That is because full and material disclosure is a fundamental principle of bankruptcy, and failure to provide such disclosure is cause under § 1104. *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D. N.M. 2009) ("Another independent ground for appointing a trustee is . . . withholding of information . . . ."); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("Where, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11

---

[21] It is for this reason that Britton has requested that withdrawal of the West Claim be conditioned on disclosure of the West/Riggs Transaction documents. To the extent Britton obtains such documents he will supplement this brief and the record before the hearing.

trustee is required."); *In re te Velde*, 2018 WL 4405981, at *2 (Bankr. E.D. Cal. Sept. 12, 2018) (cause to appoint chapter 11 trustee where debtor was "unwilling, or unable, to comply with his duties as a fiduciary" because he "lacks transparency in his dealings" and did not follow the Bankruptcy Code).

### 4.    During The Course Of The Case, Riggs Has Done Nothing To Maximize The Value Of Cloudbreak's Estate

To date, there is no indication that Cloudbreak (which is controlled by Riggs) has taken any steps to monetize assets, or investigate or pursue avoidance actions against either West or Riggs, that would benefit Cloudbreak's estate but harm Riggs.[22]  Cloudbreak's failure to do so is not surprising – it is controlled by Riggs, who certainly will not try to go after himself for over $4 million in avoidable transfers.  Cloudbreak's failure is cause to appoint a chapter 11 trustee.  *In re William H. Vaughan & Co., Inc.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (failure to commence proceedings to avoid a transfer to its president was cause to appoint a trustee because the court "cannot reasonably expect the debtor in possession, which is controlled by Vaughan, to subject to rigorous scrutiny the dealings between the two"); *Microwave Prods.*, 102 B.R. at 676 ("The failure of the debtor to investigate potential avoidable or preferential transfers weigh heavily in favor of appointing a trustee."); *see PRS Ins. Grp.*, 274 B.R. at 387 (appointing trustee because "[i]t is unrealistic to assume that the Debtor, if controlled by Mr. Lucia, will authorize or even cooperate in the investigation and prosecution of such actions").

Riggs has also ensured that Cloudbreak has done nothing to attempt to monetize its assets because doing so might generate more cash that would be beyond Riggs' control.  Now that Riggs has been caught using Cloudbreak's assets for his personal gain, he cannot seek dismissal fast enough. The Court cannot condone this behavior.

---

[22] Cloudbreak's counsel's billing statements indicate that its counsel has spent less than an hour even thinking about avoidance claims, and only in the context of a demand from Britton's counsel. ECF 280 at 82.  The only thing Cloudbreak's estate has done is stipulate to extend the deadline for commencing avoidance actions (only after Britton first identified the concern) but has indicated it does not believe any avoidance claims can succeed based on an erroneous assumption that Cloudbreak is "presumptively solvent."

1    Voluntarily seeking the protection of a bankruptcy court comes with responsibilities.  Those

2    responsibilities include fiduciary obligations to maximize assets for the benefit of creditors and to

3    refrain from taking actions that could damage the estate.  *Ionosphere Clubs*, 113 B.R. at 167.

4    For example, *In re Celeritas Techs., LLC*, 446 B.R. 514, 520 (Bankr. D. Kan. 2011) the court

5    appointed a trustee to oversee a debtor's financial disclosures, pursue avoidance actions, monitor

6    expenditures of estate assets, and manage non-bankruptcy litigation.  It explained that a trustee was

7    necessary because the Debtors filed bankruptcy as a "litigation tactic," management "was found to be

8    either unwilling or incapable of making the transition from zealous litigant to fiduciary in

9    bankruptcy," the Debtors were "improperly attempting to use bankruptcy to keep their assets and

10    evade their debt to Paradigm," and if  Debtors "did not want anyone involved in their decisions, they

11    should have filed an appeal bond and not sought refuge in bankruptcy."

12    Here, Riggs threw Cloudbreak into bankruptcy for the benefit of the automatic stay on the eve

13    of trial in the State Court Litigation.  In the three years since, he has not transitioned from a litigant to

14    fiduciary.  Rather than work to maximize the estate for the benefit of creditors, Cloudbreak and Riggs

15    have sought to protect Riggs.  Both the Cloudbreak Plan and the belated amended plan allowed Riggs

16    to keep his hands in the cookie jar, while delaying payments to creditors.  Riggs' actions, including

17    the looting of assets, the undisclosed West/Riggs Transaction, and the payments to Bungalow, are

18    plainly designed to keep estate assets away from creditors, and to engineer an exit from the case now

19    that Riggs' is at risk of losing control of Cloudbreak's cash flows.  These facts underscore the need for

20    an independent fiduciary and the continued transparency of a chapter 11 case.

21    ## V.    CONCLUSION

22    Based upon the foregoing, Britton respectfully requests that the Court enter an order

23    confirming the Plan, or, alternatively, ordering the appointment of a chapter 11 trustee.

24    DATED: December 28, 2018                    Respectfully submitted,

25                                          QUINN EMANUEL URQUHART & SULLIVAN LLP

26                                          By:    */s/ Eric Winston*
                                                  Eric Winston
27                                                Jennifer Nassiri
                                                  Razmig Izakelian
28                                          Attorneys for Layne Leslie Britton